**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-25-00091-CV**

_____

**LBK SOLID ROCK, LLC, KIEFFER VENTURES, LLC, AND JOEL KIEFFER, Appellants**

**V.**

**TEXAS WALL SYSTEMS, LLC, 83 PROPERTIES, LLC, JOSEPH HARPER, JONATHAN HARPER, AND LANCE DEAN, Appellees**

**On Appeal from the 284th District Court**
**Montgomery County, Texas**
**Trial Cause No. 22-02-01566**

**MEMORANDUM OPINION**

Appellants LBK Solid Rock, LLC ("LBK") and Kieffer Ventures, LLC ("Kieffer Ventures") (collectively "Appellants") sued Appellees Texas Wall Systems, LLC ("Texas Wall"), 83 Properties, LLC ("83 Properties"), Joseph Harper, ("Joe"), Jonathan Harper ("Jon"), and Lance Dean ("Lance") (collectively "Appellees"),

1

over a business dispute.[1] Appellees counterclaimed against LBK and Joel Kieffer ("Joel"). Since the parties' agreement contained an arbitration provision, the trial court required them to arbitrate the dispute.

Following an arbitration proceeding, the arbitrator awarded damages and attorney's fees to both Appellants and Appellees. After the arbitrator clarified the awards, the trial court confirmed the arbitrator's decision. In two issues, Appellants argue on appeal that the trial court erred in confirming the arbitration award because the arbitrator exceeded his authority in that he issued the clarification award in response to an untimely motion to modify, and the clarification award made substantive changes to the previous award. Appellants further contend that the trial court erred in confirming the arbitration award "[b]ecause the [a]ward is [i]ndefinite and [n]ot [f]inal."

Since Appellants did not meet the standard required to vacate an arbitration award, we affirm the trial court's judgment. *See* Tex. Civ. Prac. & Rem. Code Ann. § 171.088(a).

## BACKGROUND

LBK purchased A&A Stone, a supplier of landscaping material, in 2012. At that time, Joel was the sole member of LBK. With help from his sons, Josh, Bryan,

---

[1] For ease of reference, we refer to the individuals involved by their first names.

and Brandon, Joel ran A&A Stone until January 1, 2018, when LBK sold to Joe, Jon, and Lance each fifteen percent of the business for a total of $1,250,000. Appellants also sold Appellees fifty percent of Kieffer Ventures for $75,000. The parties anticipated referring business to each other to increase profits for both Appellants and Appellees. The parties' agreement provides for mediation in the event of disagreement, and dictates the following arbitration procedures:

Section. 3    **<u>Arbitration Procedures</u>**

(a) **<u>General Rules.</u>** Except for mediation provided in Section XV.2 above, and as this Article XV otherwise provides to the contrary, all proceedings required by this Article XV shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association (hereinafter designated "AAA") as then in effect; provided that such rules shall be applied in accordance with Texas law and that any questions which are not resolved by such rules shall be determined by Texas law. All parties to an arbitration proceeding under this Article XV shall make all reasonable efforts to perform their obligations under this Article XV promptly, recognizing that time is of the essence.

(b) **<u>English Rule – Loser Pays</u>**. The parties prevailing in an arbitration proceeding under this Article XV or in a legal proceeding brought in a court of competent jurisdiction to enforce or preserve the rights awarded pursuant to an arbitration proceeding under this Article XV, including all appeals, shall be entitled to recover from the other parties all costs and expenses incurred by the prevailing parties with respect to all of the proceedings, including reasonable attorneys' fees.

. . . .

(g) **<u>Arbitration of the Dispute</u>**. The arbitration shall be held in Montgomery County or Houston, Texas, at a location determined by the AAA. The decision of the arbitrator shall be final as between

Petitioner and Respondents and may be enforced or preserved upon application to any court of competent jurisdiction.

In March 2018, A&A Stone opened a second location, on land owned by 83 Properties, which is a holding company owned by Joe and Jon.[2]

The parties eventually became dissatisfied with their business arrangement. Their complaints included: (1) LBK's increased profits did not materialize as anticipated; (2) LBK assets were used to pay personal expenses; (3) Appellees increased the rent and decreased the available space at A&A2's location; (4) Appellees considered the cost of site preparation of the A&A2 location (owned by 83 Properties) to be a capital contribution to LBK; (5) rent to 83 Properties went unpaid; (6) Appellees required Appellants to sign a three-year lease on the A&A2 location or vacate the property; and (7) Appellees blocked the entrance to A&A2's location, thus impeding customer access.

The parties' pleadings against one another included allegations of fraud, fraudulent inducement, breach of fiduciary duty, breach of contract, and conspiracy. The parties also sought to recover their attorney's fees.

On October 28, 2024, the arbitrator made the following findings and awards:

---

[2] We refer to this second location as A&A2.

4

## I.

## FACTS

1. Joel Kieffer and his wife have their permanent residence in Sulphur, Louisiana.

2. They have four sons, Joel (Joey)[,] Bryan, Josh, and Brandon.

3. Joel Kieffer retired from his employment from Tepco Oil Co.

4. He was looking for a small business to purchase and build something for his sons to own and manage.

5. In 2012, Mr. Kieffer secured an SBA loan and owner financing and using his $650,000 of his retirement fund, purchased LBK Solid Rock, LLC ("LBK") dba A&A Stone ("A&A") and the lot on highway 1488 in the Conroe, Texas area.

6. Mr. Kieffer brought on his sons Joshua and Bryan to help run the company. Brandon helped with the marketing of the business.

7. Mr. Kieffer['s] original plan was to work about a year and then let his sons take over the business.

8. Brandon chose to return to school yet was still kept on the payroll.

9. Josh became a part-time employee so he could train to become a pilot.

10. A&A was profitable for several years with [a] net [] income of approx. $180,000 in 2017.

11. In 2017, Joe Harper, "Joe" stopped by A&A and made a purchase of some landscaping material. He liked the customer service and the layout of the site. Joe, his brother Jon, and Lance Dean owned Harper Brothers Construction and a landscaping business, Texas Wall. The group also owned several tracts of land; some in the Conroe area.

5

12. Joe emailed Joel and stated he was interested in "passive investments" in businesses and met socially with Joel on a few occasions and eventually discussed investing in LBK. The parties also discussed the synergies the investing group could offer LBK to substantially increase its revenue. Joel stated that Joe promised as much as $1,000,000 in revenue synergies.

13. On October 5, 2017, Joel sent Joe the 2016 profit and los[s] statement and "financials" of LBK. Joel also sent Joe a forecast that 2017 would be a better year. The financials also delineated LBK had a debt of about $1,000,000.

14. The financials also listed costs of contract labor of $70,418 and payroll expenses of $486,696, resulting in a net income of $180,313. (Ex 208) However, the balance sheet also listed debt of approximately $1,000,000. ($190,000 to M.R. Stone, the seller of LBK, and the balance of an SBA loan of $802,278.)

15. There is a dispute among Joe and Joel as to whether Joe stated, based on the financials, he wouldn't invest in LBK or if Joe just merely expressed some concerns.

16. Regardless, on October 12, 2017, Joel sent Joe exhibit 209 which has a spreadsheet of financials for January to December, 2016 with an additional column for "adjustments."

17. The first adjustment is "contract labor" which[,] in addition to the actual expense of contract labor, also included the salary for Joel's wife, Linda, and son Brandon.

18. The next adjustment was "payroll expenses" of $138,000, which was comprised of Joel's salary and "extra staffing."

19. Joel was confused about the chart allocation of "contract labor and payroll expenses."

20. The next expense was "corporate housing" of $22,750, which is actually the rent for Joel's townhome.

6

21. Further, there was an adjustment of $5,800 for "cable." Joel was also confused as to what items were covered under this adjustment.

22. The adjustment of $14,500 was for payment of Joel's life insurance policy.

23. These 2016 financials showed an adjusted earning before interest, taxes, depreciation, and amortization ("EBITDA") of $691,709.

24. The 2017 financials for A&A Stone also includes a series of adjustments similar to 2016 financials with an EBITDA of $589,441.

25. Joel also sent projections to Jon and Lance of the combined EBITDA of A&A and A&A2 for the first three years of operations of $618,930, and $1,032,000 respectively, without any amount allocated for synergies received from Texas Wall.

26. Joel stated that he wanted Joe, Jon, and Lance to invest in LBK because they had the ability to provide capital investment and provide certain synergies that would benefit LBK.

27. The purpose of Joel's projection was to allow Joe, Jon, and Lance to decide if, and how much, they wished to invest and for what section of the ownership of LBK.

28. After further discussions[,] the parties entered into an agreement (Amended Restated Company Agreement) (Ex 225) prepared by the Cokinos Law Firm. Joe, Jon, and Lance (investment managers) would pay $1,250,000 for a cumulative 45% interest in LBK and would become three of the seven managers.

29. Further, the parties executed the Kieffer Ventures Membership Agreement in which Joe, Jon, and Lance paid $75,000 for 50% interest in the LBK property on 1488.

30. The managers were not to receive a salary as a manager.

31. The Amended and Restated Company Agreement ("Agreement") (Ex 225)[,] [c]ontained a provision entitled "Special Loans." (Paragraph []VIII §8 of the Agreement)

32. Attached to the Agreement was a schedule 8, which delineates the discretionary expenses incurred by Joel Kieffer.[]

33. Section 8 states, in short, that discretionary expenses incurred by Joel Kieffer for the categories listed in Schedule 8, shall be secured by a promissory note from Joel Kieffer to LBK. The promissory note is interest free if repaid by Joel Kieffer by January 1 of the year following the date of the Special Loan. The amount of the Special Loan cannot exceed the cash on hand of the company.

34. Section 8 was inserted into the Agreement because of the concern Joel Kieffer was "passing through" personal expenses such as rent for his townhome and salaries to family members not employed by LBK.[]

35. Joel executed a promissory note for the "special loan" amount for the year, 2018. He, however did not execute a promissory note for the year 2019-2023. The amount received under the "special loan provision" without executing a promissory note became a point of contention with the investment managers, specifically Joe. Joel justified his inaction by pointing to the lack of income from the synergies "promised" by the investment managers.

36. In January, 2019, Joe then questioned some credit card charges in January, 2019, especially in light of the poor performance of A&A in 2018.

37. Specifically, Joe was concerned about the charges for trips to, among other places, the Grand Caymans, and expenses for several rounds of golf.

38. Joel stated these charges were bonuses, paid by the points earned from [L]BK credit cards. The cards' statements also delineated charges for lunches and dinners as well as other vacations to various theme parks.

8

39. Joe was forced to make a loan to A&A for $175,000.

40. Joe then addressed the issue of salaries paid to Jeff Sanders[] (the manager of A&A)[,] Josh, Bryan, Joel, and Linda. Joe noted that Josh and Bryan were each paid over $100,000 a year, which is an inordinate amount to pay for the supervision of eleven (11) employees. The biggest concern for Joe was that Linda, who didn't have a defined job at LBK, was receiving a salary, approaching $200,000 a year.

41. Joel stated this amount included part of his salary but it was paid to Linda to increase her earnings as a basis of determining social security benefits at age 65.

42. Joel also raised the issue of the lack of synergy from the investment managers, specifically on a $300,000 landscaping project in which A&A was the low bidder but still lost the job.

43. Joel acknowledges that Texas Wall sent "leads" to A&A for bids of about $1,500,000, but A&A's largest sale through these leads was $30,000.

44. However, Joel stated that A&A certainly expected more through prospects referred by Texas Wall and Dean Builders, but the lack of profitable synergies "was nobody's fault."

45. The parties discussed the expansion to a second A&A site. The investment managers stated they were in favor of opening A&A2 as long as the investor managers' "capital commitment" didn't exceed $300,000.

46. Joel, after the "buy in" from the investment managers and the payment of debts, left approximately $278,000 in the company to be used for expansion for A&A2.

47. Joe offered to lease one of his properties located on Riley Fuzzel ("RF") street (off Highway 99 in Montgomery County) as a site for A&A2. The property was owned by "83 Properties," one of Joe's tracts of land.

9

48. In 2017, Joel viewed the RF site, which was in a flood zone and was raw land.

49. Without a lease in place, LBK approved using the RF site and Joe's construction company (Harper Brothers Construction) which built a road to accommodate large truck traffic and stabilized the soil to allow truck and pedestrian traffic. Harper Brothers Construction provided a water well and a septic tank and connected the electricity to A&A2's office. Joe set aside two and a half acres for the A&A2 location. Joel moved a trailer onto the property which had a deck and a front porch. Bins were installed to house the landscaping product of A&A2. Further, Harper Brothers Construction built a wall which displayed some of the construction material offered by A&A. The Kieffers worked tirelessly to attract business to A&A2.

50. By April of 2018, A&A2 was open for business.

51. Harper Brothers Construction invoiced Joel for, among other things, the porch, the entry signs, the cedar boards, and the sample well. Joel disputed the invoice but paid $55,711 to Harper Brothers Construction, which was approved by the LBK board of managers. The initial rent to be charged by 83 Properties was $4,800 per month, despite the lack of a written lease agreement.

52. A board meeting was called for May 23, 2018, to discuss, among other items, an increase in rent for the two and a half acres of land used by A&A2 at the RF site.

53. Joe proposed an[] increase from $4,800 a month to $6,000 a month; which was "within a viable range for same and similar property in the Conroe area."

54. There was an exchange of emails prior to the meeting in which Joe admitted that he could have been clearer about his approach to creating the A&A2 site. Moreover, Joe's emails indicated the increase of rent to $6,000 per month was also to help [de]fray the $384,000, his construction company charged for preparing the A&A2 site.

10

55. The managers approved the "temporary" rate increase and Joel stated he entered into the deal with his eyes wide open.

56. The lease amount was noted as temporary until Bryan and Lance conducted a study on comparable rates for similar property in the area.

57. Joel didn't pay the seven months back rent or the $55,711 Harper Brothers Construction invoice until he received the PPP loan in 2020.

58. Joel issued a budget for A&A2 in 2019 and stated that if RF was not "$50,000" positive by May, "LBK should shut the door or relocate."

59. RF continued to struggle in 2019. A potential buyer of A&A2, Site One, stated it wanted to wait a couple of years to see how A&A2 matured.

60. In late 2020, Joe complained again about the "green waste" which is a service A&A2 provides to customers to leave their branches and other trimmings at the site.

61. Although A&A2 has a removal service in place, Joe states he believes A&A2 is becoming a dump site.

62. Joe also complained about Jennifer, who was Joel's manager at the A&A2's site. He then requested the financials of LBK as well as the special loan information for 2018 and 2019.

63. In November 2020, Joe sends a proposed three-year lease agreement to Joel believing this would prevent the sometimes-erratic rent payments made by A&A2 to 83 Properties. The lease agreement essentially made A&A2 liable for any injuries or damages occurring on the entire 10 acres; including the Harper businesses housed therein which weren't paying rent.

64. Joe also sought an update on the financials and the special loans.

65. Joel had the three-year lease agreement proposed by 83 Properties reviewed by an attorney who makes wholesale changes to the proposed lease.

66. Joel returned the lease agreement with the proposed changes to Joe.

67. The parties couldn't agree on the lease terms and Joe sent an email to the board of managers of LBK that A&A2 must vacate the RF site by the end of the year. This provided A&A2 a six-month window to locate a new location.

68. LBK couldn't find a comparable place to lease in the surrounding area for A&A to open a second site.

69. Joel emailed the investment managers that operations at both sites were improving year over year, and he was unsuccessful in locating a site suitable for A&A2.

70. Joe responded that if A&A2 was making a profit, then he required a copy of the W2's for the employees and the 2020 K1's for the Kieffer managers. Also, he inquired when "intangible assets" were added to the balance sheet.

71. Joel responded that A&A found a site but it couldn't be ready until December 31, 2022.

72. Joe responded A&A could either move its inventory at the A&A site, or keep the inventory at RF and pay a month's rent.

73. A&A2 didn't move to a different site and the inventory was moved to A&A.

74. Joel sent an email to LBK managers stating Joe and Jon insisted that A&A2 shut down, Joel added the RF site would be "increasing profitable" and was a "growing location" with a revenue increase year over year.

12

75. Joe responded that the loss of the RF site was the fault of A&A as it could have found another comparable site. Further, A&A shouldn't have complained so much and paid its rent on time.

76. In February of 2022, LBK Solid Rock and Kieffer Ventures sued Texas Wall Systems, 83 [P]roperties, Joe and Jon Harper and Lance Dean. The Respondents filed an answer and a counter claim. The case was sent to the American Arbitration Association for resolution.

II.

CLAIMANTS' CAUSE OF ACTIONS

LBK is alleging that Joe Harper made three statements to induce Joel into entering into a "partnership." a) Investing managers would provide a "capital" infusion which would allow A&A to expand; b) The investing managers had land for expanding; and c) That the synergies between the investment managers and LBK would increase the A&A revenue by $500,000 - $1,000,000 per year.

Joel alleges that the investing managers improperly evicted A&A2 from the RF site and breached their fiduciary duties to LBK.

A. CAPITAL INFUSION

Joel's testimony focuses on the "capital commitment[]" made by Joe who promised to make a capital contribution for the development of the RF site or "any other site Joel selected."

Joe testified he spent over $374,000 developing the 10 acres at RF for A&A2.

Joe then asked Joel to reimburse him $55,711 for specific work performed by Harper Brothers Construction Company. Joel eventually paid Joe the $55,711 for the "extra expense."

Joe then increased the rent A&A would pay on the RF site. This increase was, theoretically, to bring the rent to a "viable" amount.

13

Joe acknowledged that the increase in rent was also to help [de]fray the construction costs incurred by Harper Brothers Construction.

In a unanimous vote, the managers of LBK approved the increase of rent to 83 [P]roperties of $6,000 a month.

Capital contributions can be cash, property, or services. (*See* TLLCA §5.02)

The services provided by Joe, through his construction company, was valued at approximately $374,000.

However, the $374,000 contribution was for the improvement of land owned by 83 Properties; which is owned by the investing managers.

Regardless, the entire contribution was meant to the benefit LBK.

When A&A2 left the RF site, the Respondents utilized the 83 property for the benefit of their companies. This included a portion of the two and a half acres improved specifically for A&A2.

If Joe would have provided a capital contribution of $300,000 cash, the RF location would have still required significant improvements to make it an accessible and viable site. There wasn't any evidence offered that A&A2 would have been profitable if the contribution was paid in cash as opposed to services.

## B. Synergies

Claimants' contend that Respondents' fraudulently induced them into entering into "partnership" by promising $500,000 - $1,000,000 of sales through the synergies by reason of the investing managers businesses. The Harper Brothers Construction Company's business was construction projects for the government.

Claimants' frustrations began when their bid for the landscaping services on [] Respondents' projects was rejected even though they were the low bidder.

14

The Claimants' testified that their largest sale through Respondents['] "leads" was $30,000. Claimants also sought "captured sales" from Respondents', that is, Respondents should have chosen A&A for its landscaping projects or told A&A to match or beat the lowest bidder's price and then be selected as the landscaping sub-contractor.

The actions of the landlord (Joe, John, and Lance) was not in the best interest of LBK; to whom it owed a fiduciary duty. Although Respondents' may have worn their landlord hat, they never removed their manager's hat.

Claimants testified about a litany of actions committed by the Respondents were labeled breaches of a fiduciary duty (having rent to $6,000 per month to help pay for the site preparation which was unanimously approved by the board managers, blocking traffic; denied customer parking.)

The Respondents invested $374,000 to improve the A&A site, which they own.

Their capital commitment was to LBK. Once A&A2 left the site, the improvements would solely [be] to the benefit of Respondents, who then occupied the site. LBK lost any benefit it was to receive from the capital contribution made by Respondents.

Joe responded that A&A was sent numerous leads but A&A either failed to follow through with the bidding process or A&A prices were too high.

Confusingly, Bryan Kieffer was asked by Texas Wall, to work with Katrina, their sales person and pass on any bid opportunities to Katrina so Texas Wall could also bid the job.

The investment managers testified about numerous leads for bids they sent to LBK; which either didn't submit a bid or its bids were rejected. Regardless, A&A did not realize a significant increase in revenue from its synergistic relationship with Texas Wall. Because both sides agreed several opportunities were sent by Respondents to Claimants, there wasn't a fraud in the inducement.

15

Further, Joel concluded it really "wasn't anyone's fault." That being said, the facts don't indicate the parties' discussion of synergies rise to the level of fraudulent inducement.

## C. LBK's CLAIM FOR BREACH OF FIDUCARY DUTY

Although the Texas Business Organization Code ("BOC") does not define o[r] expressly impose fiduciary duties on managers or members, Texas law has found such duties to exist.

Because BOC recognizes managers are agents of the company, (*See* §161.254) the Courts have used agency law to define the duties of a manager managed LLC. Agency law holds agents acting on behalf of the company owe the LLC a duty of care. Further, a manager in a manager managed LLC owes the LLC a duty of loyalty.

In *CyberX Grp., LLC v. Pearson*, 2021 WL 1966813 (N.D. Tex. 2021) the court, applying agency law, stated that if corporate officers owed fiduciary duties to the corporation, then managers would owe fiduciary duties to the LLC. In *Katz v. Intel Pharma, LLC*, 20[]20 WL 3871493 (S.D. 2020) the court concluded managing members owed the LLC fiduciary duties. These duties include the duty of obedience, duty of loyalt[y], and duty of care to the LLC. Furthermore, BOC §3.102 and 3.105, states that the information supplied to the LLC by the manager should be accurate because managers owe a duty of ca[re] in their decision making.

Texas law is split as to whether a manager owes his fellow managers fiduciary duty, *Villareal v. Saenz*, 2021 WL 1558009 (W.D. Tex. 2022). However, some courts have held that a manager may owe his fellow manager an informed duty of trust and confidence. (*See Allen v. Devon Energy Holdings, LLC*, 367 S.W.3d 355 (Tex. App.—Houston [14 [D]ist.]) Regardless, Texas law is clear that managers owe a fiduciary duty to the LLC. (*See* BOC §101.401 and *Katz supra*).

The Amended and Restated Company Agreement fails to expand a limit of the duties owed by a manager to a manager or the duties owed the LLC by the managers.

16

Joe, on the behalf of the minority owners, promised a capital contribution not to exceed $300,000 to develop the site for A&A2.

Joe testifies the "investing managers" spent $374,000 developing the RF site.

The promise of the contribution by then investing managers complied with Texas Limited Liability Company Act ("TLLCA") §5.01 in that it was in the form of cash, promissory note, or services. The capital contribution was made to the LLC, not the managers or their respective company. The contribution was not a breach of fiduciary duty the minority managers owed to LBK. The contribution was in the form of services for the benefit of the LLC. However, 83 Property's ultimately profited by the contribution. The Harper Brother's entities moved on the renovated site after A&A2's inventory was removed.

Dr. Moll, who is very knowledgeable in this area, opined that the investing managers can remove their "manager's hat" and replace it with their "landlord hat" and hence, deal with A&A2 (LBK) at an arm's length. Claimants' cite several cases which state that a "fiduciary duty" cannot be viewed in a vacuum.[]

83 Properties and the Harper Brother's various entities now occupy a site paid by a contribution of $374,000 to the LBK Solid Rock, LLC in the form of services. This was a breach of the investing managers fiduciary duty to LBK. 83 Properties is liable to the LBK in the amount of $355,711.[]

Having written and lectured in the area of breach of fiduciary duty, I cannot understand the "bamboo wall" theory of switching hats. Whether couched in terms of breach of fiduciary duty or unjust enrichment. Respondents owe LBK the $355,711.

## D. CLAIMANTS' DAMAGE EXPERT

Claimants' lost profits expert, Michael Brown, opined that the investing managers caused that LBK to incur losses of $3,691,598:

   a) lost profits of $2,272,674 to LBK, including lost synergies of $1,030,171;

17

b) loss of profits to Joel Kieffer of $273,647;

c) $202,121 for unnecessary health benefits approved by the board of managers;

d) $21,850 inventory left at the RF site; and

e) $55,711 for additional cost of the site preparation for A&A2.

Mr. Brown bases his loss earnings on an extrapolation of the increase in revenue year over year for A&A2. However, the revenue at RF declined year over year. Nevertheless, Mr. Brown opines that RF revenue would increase once a new site for RF is established in 2024 and continue through 2029.

Mr. Brown admits that predicting loss profits is always speculative. However, predicting loss profits for a company that has a history of profits is based in peer reviewed accounting. But predicting lost profits for a company that never realized a net profit prior to closing is speculation; especially for regarding a nonexistent site for years 2024-2029. Undoubtedly, the closing of A&A2 injured LBK.

Mr. Brown's calculations do not meet the reasonable certainty standard established by law. There were no objective facts, figures, or data to indicate that A&A2 would ever be profitable.

Moreover, there was not any evidence of reasonable certainty that the A&A would have opened at a different location for the years 2023-2026. Mr. Brown's opinions are too speculative.

Finally, LBK failed to mitigate its damages by reopening at a different location. There must be evidence that some profits would have occurred in the future.

Texas Courts do not require an exact calculation of lost profits, the evidence presented must show objective facts, figures, or data that support the damages amount. *Pura-Flow v[.] Clanton*, 635 S.W.3d (Tex. 2021)

## III.

## THE RESPONDENTS' COUNTERCLAIMS AND THIRD-PARTY ACTION

## A. RESPONDENTS' CLAIMS OF BREACH OF FIDUCIARY DUTY BY THE CLAIMANTS

### THE LBK EBITDA

Prior to the investment from Respondents, Joel was categorizing some of his personal expenses as business expenses.[]

These "pass through" items were included in the initial financials Joel provided to Joe in 2017.

Joe responded that the return was too low to warrant a sizeable investment.

Joel then proposes new financials which become the pass-through items in a different column titled "Adjustments."

Ex 209 indicated an EBITDA of $691,709 for 2017 if the adjustments are removed from the spreadsheet.

The investment managers reviewed the new EBITDA calculations and believe the adjustments would be removed as expenses of LBK.

Based on the projected EBIT[D]A's of LBK in Ex 209 for the years 2017-2019, the Respondents invested $1,250,000 in return for a 45% ownership of LBK.

## B. WASTE OF ASSETS

Respondents' allege that Joel Kieffer, sons Joey, Bryan, and Josh, routinely received raises without the approval of the managers.

Each of the sons were paid approximately $140,000 a year. The site foreman was paid $145,000 a year.

Joel's salary is difficult to determine as the proceeds were extracted from "pass through" accounts such as contacts[,] labor and extra staffing.

The salary paid to Joel's wife Linda, is also confusing in that Joel testified Linda's salary may have included part of his salary.

Regardless, the forensic accounting by Respondents' expert "Capstone" reported Linda's salary from 2018-2021 to be $709,000. Further, the report also found that the Kieffer family was paid $1,858,085 between 2018 and 2021.

The confusion of whether Linda's salary included Joel's salary between 2018-2021 is a system of a larger problem: the Kieffers breached the fiduciary duty they owed LBK and its managers to deal with LBK, in good faith, openly and honestly, and the utmost fairness and candor.

## C. THE SALARIES OF THE MAJORITY MANAGERS

Joel's salary:

a) Joel testified he is somewhat confused about the amount of, and source of his salary;

b) He may certainly split his salary with his wife, Linda, to boost her social security earnings. However, Linda is not an employee of LBK and is not entitled to a salary independent of sharing Joel's salary as community property; and

c) As a manager of LBK, he has a duty to keep all the managing managers informed of the expenditures of LBK.

Respondents allege that the Kieffers[] received salaries totaling $1,858,085 in total wages from 2018-2021.

These salaries are in addition to the salary of Jess Sanders, who is the yard foremen at A&A.

What isn't clear is the exact amount of salary paid to Joel and Linda. In the hearing, Joel testified his salary was probably part of "contract labor" and that could include Linda's salary.

Joel owed LBK the duty to be transparent about the exact amount of his salary and whether his wife was receiving a salary independent of his salary.

This lack of candor and utmost fair dealing with LBK are breaches of fiduciary duty.

Compton stated that Linda Kieffer received $609,000 in salary in the years preceding 2022.

## D. SPECIAL LOANS

The Amended Restated Company Agreement was drafted by a member of the Cokinos firm with input from the Claimants and the Respondents.

The purpose of (Ex 225; Article 8, §8) "Special Loans" was to allow Joel Kieffer to make some discretionary purchases secured by a promissory note. The areas of discretionary spending are: extra staffing, corporate housing, and contract labor.

Regardless, the purpose of the provision was to ensure that Joel could not "pass through" personal expenses without being secured by a promissory note.

No one asked any of the Kieffers to work for free. Rather the intent was to have a clear delineation of the salary of each member of LBK, rather than continuing with comingling salaries under the vaguely phrased accounting terms. The "special loans" were to be secured by a promissory note from Joel Kieffer. Mr. Kieffer failed to execute a promissory note after the first year.

## E. THE LBK CREDIT CARDS

LBK issued credit cards to several of its employees including the Kieffers and selected personnel.

The credit cards were used to purchase all A&A inventory accumulating millions of points which could be used as capital.

The credit cards were also used to buy food for the card holder.

The points were used as bonuses for the Kieffer family vacations and golf outings.

The points accrued through the credit card purchases are the property of LBK. Therefore, the monetary equivalent of the trips bought with points is due and owing to LBK by the Kieffers.

## F. SHAREHOLDER OPPRESSION

The Texas Supreme Court stated that corporate officers and directors owe their fiduciary duties to the corporations, not the individual shareholders. *Ritchie v. Rupe*, 443 S.W.3d 856 (Tex. 2014). The definition of oppression is now defined as *the abuse of authority by management with the [] intent to harm an owner in disregard of management's honest businesses judgment and declined to recognize a common law action for oppression.*

The remedy of breach of fiduciary duty is not available to minority shareholders.

## G. CONSPIRACY

Respondents' cause of action for conspiracy is an element of shareholder oppression and is not available to the Respondents under this fact pattern.

## DAMAGES AS THE RESULT OF CLAIMANTS' BREACH OF FIDUCIARY DUTIES

The Capstone Report concluded that Linda Kieffer received salaries of $709,092 between 2018-2021. The report also indicated that Joel Kieffer paid himself and his wife an annual salary and benefits exceeding $200,000. This implies that Joel Kieffer was receiving a portion of the $709,802 funneled to Linda. The Kieffers shall pay the

Respondents breach of fiduciary duties damages in the amount of $500,000.

## H. BREACH OF CONTRACT

Respondents' claims for breach of contract enumerate several Articles of the Company Agreement in which the majority of managers failed to comply. The list of breaches relate to the failure to conduct manager meetings in which:

a) the salaries of the Kieffers were discussed;

b) the failure to produce quarterly and annual financial reports;

c) maintain accurate records subject to review by the investing managers; and

d) obtain manager approval for capital contributions.

Article IV, Section 5 states that Special meetings may be called by any manager.

Respondents' claims for breach of contract are essentially a restatement of its claims for breach of fiduciary duty. That is, the Kieffers failed to engage in perfect candor and open and honest delineation of their salaries; specifically, that of Linda and Joe.

## AWARD

THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into between the above-named parties and dated January 1, 2018, and having been duly sworn, and having duly heard the proofs and allegations of the Parties, hereby AWARD as follows:

Claimants shall have and recover from Respondent actual damages of $355,711 and attorney's fees of $490,887.50 and expenses of $76,367.53 on or before February 1, 2025. If the Claimants' damages, attorney's fees, and expenses are not paid by February 1, 2025, the entire amount shall accrue interest of 8% until paid.

23

Respondents shall have and recover from Claimants pursuant to their counter-claim, actual damages of $500,000 recoverable attorneys' fees and litigation expenses of $1,294,161.74 to be paid on or before February 1, 2025. If said amounts are not paid on or before February 1, 2025, the said amounts shall accrue interest at the rate of 8% per annum until paid.

**AAA and arbitrator cost assessment**
The administrative fees and expenses of the American Arbitration Association totaling **$32,350.00** shall be borne by Respondent, and the compensation and expenses of the arbitrator totaling **$59,675.00** shall be borne as paid.

This Award is in full settlement of all claims and counterclaims submitted to this Arbitration. All claims not expressly granted herein are hereby, denied.

This Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute together one and the same instrument.

October 28, 2024                                        [Arbitrator's signature]

After reviewing the arbitrator's award, Appellants moved to vacate the award on the grounds that the arbitrator "exceeded his authority and rendered an award that is unenforceable due to lack of clarity and finality, by making findings against individuals who were not parties to the arbitration and by granting relief that is indiscernible." Appellants further sought to clarify the award, since it did not state "with specificity who holds judgment against whom[.]" Appellees likewise requested clarification of the award, so that it would state "who pays who[m]." The parties filed their respective motions to modify or clarify the award on Monday,

24

November 18, 2024. After the arbitrator denied these motions, he responded to Appellees' Motion for Reconsideration by issuing his Clarification Award on January 29, 2025.

On January 29, 2025, the arbitrator issued the following clarification award:

This modified award is in response to Respondents' Limited Motion for Reconsideration to Clarify Payees and Payors of Final Award.

### I.  BUSINESS JUDGMENT RULE AND BREACH OF FIDUCIARY DUTY.

1.  The business rule does not protect a corporate officer from self-dealing acts[] or for a breach of fiduciary duty.[]

2.  The manager of an LLC would owe the LLC the same duties (fiduciary) as a corporate officer or partner.[]

3.  The duty of loyalty holds officers and directors to an extreme measure of candor unselfishness and good faith.

4.  "A derivative action provides a procedural pathway for a minority shareholder to sue on behalf of the company.[]

5.  A fiduciary must act with the utmost good faith and exercise the most scrupulous honesty.[]

6.  Respondents counter claimants brought a derivative claim and at the time of filing counter claimants (individual managers) may have met all the requisites of TBOC section 21.552 (although Texas BOC Section 21.563 holds that the requisites of Section 21.552-21.560 do not apply to a claim or a derivative proceeding by a shareholder in a closely held company. . .).

7.  Therefore, in a closely held corporation, a derivative proceeding brought by its shareholder of closely held corporations may be treated by a court as a direct action brought by the shareholder for the

25

shareholders' own benefit and may be paid directly to the "plaintiff." Further, the plaintiff need not file a derivative action demand.

## II. JOEL KIEFFER

8.    Joel Kieffer may have had good intentions to expand LBK Solid Rock (A&A).

9.    However, his desire to ensure his sons will have a business to provide them with a living upon his death, increase his personal wealth, and to help his wife increase her Social Security income, caused him to violate his duty to the other managers of the LLC and fiduciary duties to the LLC.

10. Mr. Kieffer's breached his fiduciary duty by failing to interact with the utmost good faith or exercise the most scrupulous honesty to his co-managers and the LLC and failed to fully disclose all important information to his co-managers.

## III. JOEL'S SALARY

11. During this existence of the LLC (2018 to 2023), salaries were paid in the name of Linda Kieffer in the amount of $1,083,828.36.[]

12. The award references payments to Mrs. Kiefer through 2021 as the evidence was clear by 2021 that the Respondents' managers discovered that Mrs. Kieffer was receiving all or a part of Joel's salary.

13. What wasn't clear to the managers is that a large part, if not all, of Joel's salary was reported as income by Linda Kieffer, a non-employee.

14. That fact, coupled with Joel Kieffer's breach of fiduciary duty to execute an annual promissory note for his "discretionary spending" is the basis of the damage award of $500,000.

15. Joel Kieffer did perform limited services on behalf of the LLC from the years 2018 to 2023. He is entitled to some compensation for his endeavors during those years.

16. Therefore, after allocating salary commensurate to those of his sons and deducting that amount from the $1,083,829.36 ("Linda's Salary") and adding the value of the unsanctioned vacations and credit card points, the result was very close to $500,000.

17. Based on the discussion of derivative claims for closely held companies, the $500,000 in damages shall be paid by Joel Kieffer directly to the individual counter claimant investors: Joe Harper, John Harper and Lance Dean.

## IV. THE CLAIMS OF LBK LLC AND KIEFFER VENTURES

18. The award provides a good delineation of the underlying reasoning of liability and damages resulting from the conduct of the Respondents.

19. The damages and attorneys' fees awarded to LBK Solid Rock, Joel Kieffer and Kieffer Ventures, LLC is the joint and several liability of 83 Properties, Joseph Harper, and Jonathan Harper.

## V. THE ATTORNEYS' FEES

20. The majority of the attorneys were well prepared and performed a worthy service on behalf of their clients.

21. Pursuant to the arbitration clause and formation documents of A&A, the persons or entities responsible for monetary damages shall also be held responsible for payment of all opposing counsel's attorney's fees expended to achieve a remedy for the prohibited actions (English Rule Bate Stamp 7138).

## VI. AWARD *(as clarified)*

22. I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration Agreement entered into by the above-named parties, and dated January 1, 20[1]8, and having been duly sworn and having duly heard the proofs and allegations of the parties, and have previously rendered an award dated October 28, 2024, and John Warren on behalf of Respondents having submitted a motion for reconsideration by letter dated January 9, 2025 and Megan Rapp on

27

behalf of Claimant and Third Party Respondents having responded by letter dated January 21, 2025, do hereby, DECIDE, as follows:

23. Claimants (LBK Solid Rock, LLC, Joel Kieffer, and Kieffer Ventures) shall have and recover from Respondents (Joe Harper, Jonathan Harper, and LLC 83 Properties, jointly and severally) actual damages of $355,711 and attorneys' fees of $490,887.50 and expenses of $76,367.53 on or before March 1, 2025. If the Claimants' damages, attorneys' fees, and expenses are not paid by March 1, 2025, the entire amount shall accrue interest of 8% until paid for which let execution issue.

24. Respondents (Joe Harper, Jonathan Harper, Lance Dean, and LLC 83 Properties) shall have and recover from Counter-Respondent, Joel Kieffer, pursuant to their counterclaim and third-party claims, actual damages of $500,000 in attorneys' fees and litigation expenses of $1,294,161.74 to be paid on or before March 1, 2025. If said amounts are not paid on or before March 1, 2025, the said amounts shall accrue interest at the rate of 8% per annum until paid for which let execution issue.

25. The administrative fees and expenses of the American Arbitration Association totaling $32,350.00 shall be borne equally by the Parties, and the compensation and expenses of the arbitrator totaling $59,675.00 shall be borne as paid.

26. This Award is in full settlement of all claims and counterclaims submitted to this Arbitration. All claims not expressly granted herein are hereby, denied.

27. In all other respects, my (our) award dated October 28, 2025, is reaffirmed and remains in full force and effect.

28. This Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute together one and the same instrument.

January 29, 2025                              [Arbitrator's signature]

Pursuant to Appellees' application, the trial court entered a judgment confirming the arbitration award regarding the claims submitted to arbitration. The trial court also denied Appellants' motion to vacate the arbitration award.

## ANALYSIS

We review a trial court's decision to confirm or vacate an arbitration award under a de novo standard of review. *See D.R. Horton-Tex., Ltd. v. Bernhard*, 423 S.W.3d 532, 534 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Texas law favors arbitration, and under Texas law, the review of arbitration awards is "'extraordinarily narrow.'" *Hoskins v. Hoskins*, 497 S.W.3d 490, 494 (Tex. 2016) (citation omitted); *Southwinds Express Constr., LLC v. D.H. Griffin of Tex., Inc.*, 513 S.W.3d 66, 70 (Tex. App.—Houston [14th Dist.] 2016, no pet.). An arbitrator's award is given great deference when it is reviewed by a court, and such awards are presumed to be valid. *See Southwinds Express Constr.*, 513 S.W.3d at 70 (citing *CVN Grp., Inc. v. Delgado*, 95 S.W.3d 234, 238 (Tex. 2002)). Generally, even where the arbitrator has made a mistake of law or fact, courts are not allowed to vacate or modify the award. *See Forest Oil Corp. v. El Rucio Land & Cattle Co., Inc.*, 446 S.W.3d 58, 75 (Tex. App.—Houston [1st Dist.] 2014, *aff'd*, 518 S.W.3d 422 (Tex. 2017). To the contrary, a court shall "modify or correct" an award if:

(1) [T]he award contains:
  (A) an evident miscalculation of numbers; or
  (B) an evident mistake in the description of a person, thing, or property referred to in the award;

29

(2) the arbitrators have made an award with respect to a matter not submitted to them and the award may be corrected without affecting the merits of the decision made with respect to the issues that were submitted; or

(3) the form of the award is imperfect in a manner not affecting the merits of the controversy.

Tex. Civ. Prac. & Rem. Code Ann. § 171.091(a).

Vacating an arbitrator's award is similarly difficult, in that it requires a party to show:

(a) On application of a party, the court shall vacate an award if:
(1) the award was obtained by corruption, fraud, or other undue means;
(2) the rights of a party were prejudiced by:
   (A)   evident partiality by an arbitrator appointed as a neutral arbitrator;
   (B)   corruption in an arbitrator; or
   (C)   misconduct or wil[l]ful misbehavior of an arbitrator;
(3) the arbitrators:
   (A)   exceeded their powers;
   (B)   refused to postpone the hearing after a showing of sufficient cause for the postponement;
   (C)   refused to hear evidence material to the controversy; or
   (D)   conducted the hearing, contrary to Section 171.043, 171.044, 171.045, 171.046, or 171.047, in a manner that substantially prejudiced the rights of a party[.]

*Id.* § 171.088(a)(1), (2), (3).[3]

---

[3] The Federal Arbitration Act contains similar grounds for modifying, correcting, or vacating an arbitration award. *See* 9 U.S.C. §§ 10, 11.

Appellants argue that the trial court erred in confirming the arbitrator's award because (1) the arbitrator exceeded his authority and because (2) the award is indefinite and not final.

Issue One: Arbitrator's Authority

Appellants contend that the arbitrator exceeded his authority by clarifying his award in response to an untimely motion to modify and by making substantive changes to the award. We address these arguments separately.

Both parties' Motions to Modify the arbitrator's initial award requested not only modification, but clarification. In fact, Appellees' motion specifically sought "three minor clarifications[,]" and Appellants' motion asked the arbitrator to "clarify with specificity who holds judgment against whom[.]" Since Appellants and Appellees agree that both of these motions to modify or clarify were filed within the twenty-day time frame set forth in the AAA Rules and the Texas and Federal arbitration acts, both parties timely requested clarification of the arbitration award. *See* 9 U.S.C. § 11; Tex. Civ. Prac. & Rem. Code Ann. § 171.054(c); Am. Arb. Ass'n., *Construction Industry Arbitration Rules and Mediation Procedures* 52 (2024), https://www.adr.org/media/kydkdsn1/construction-industry-arbitration-rules-and-mediation-procedures-2024.pdf.

Appellants' argument does not, however, hinge on the timing of these motions. Instead, Appellants contend that since the arbitrator made his clarified

31

award in response to Appellees' request for reconsideration, and since the rules do not address a request for reconsideration, both the request for reconsideration and the arbitrator's clarification were improper. Using this reasoning, Appellants claim that the arbitrator's clarification award exceeded his authority.

We do not view the arbitrator's authority as narrowly as Appellants do. "The scope of the arbitrator's authority depends on the language in the arbitration provision[.]" *Midani v. Smith*, No. 09-18-00009-CV, 2018 Tex. App. LEXIS 8954, at *15 (Tex. App.—Beaumont Nov. 1, 2018, pet. denied) (mem. op.) (citation omitted). We therefore look to the parties' agreement to determine the arbitrator's authority and whether he exceeded it. *See id.* In the instant case, the parties' agreement sets permissible locations for arbitration and requires the use of AAA Rules and Texas law but does not otherwise limit the arbitrator's power to clarify his previous decision. The AAA rules and Texas and federal arbitration acts likewise do not prohibit a reconsideration request and set no time limits for clarification. The arbitrator therefore did not issue his clarification award "in [r]esponse to an [u]ntimely [m]otion to [m]odify" as Appellants have argued.

Appellants also argue that the clarification award substantively changed the original award. We disagree. In his original award, the arbitrator used party designations such as "Claimant," "Respondent," and "investing managers." After the parties noted the lack of clarity engendered by these designations, the arbitrator

32

clarified the award using the parties' names but making no other changes. The original award, like the clarified award, referenced damages payable to Appellants of $355,711 and attorneys' fees of $490,887.50 and expenses of $76,367.53. Both the original and the clarified awards permit Joe, Jon, Lance, and 83 Properties to recover damages of $500,000 in attorneys' fees and litigation expenses of $1,294,161.74. Using names instead of party designations is not a substantive change, and the arbitrator therefore was permitted to make these changes. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 171.054(a)(2), 171.091(a)(1)(B) (permitting clarification if an award contains "an evident mistake in the description of a person, thing, or property referred to in the award.").

In an analogous case, our sister court affirmed the trial court's confirmation of a clarified arbitration award wherein the appellant contended that the arbitrator exceeded his authority and changed the original award. *See Daniewicz v. Thermo Instrument Sys., Inc.*, 992 S.W.2d 713, 715-17 (Tex. App.—Austin 1999, pet. denied). Stating that "[a]rbitrators may modify or correct an award to clarify the award[,]" the *Daniewicz* court held that "[t]he trial court did not err in finding that the arbitration panel's clarification order merely restated the intent of the original order and was not an impermissible modification." *Id.* at 716, 719. The same logic applies here: the arbitrator's clarification restated the intent of his original order by using the parties' names rather than their party designations. Since the arbitrator did

33

not exceed his authority in clarifying his award and since the clarified award contains no substantive changes, we overrule Appellants' first issue.

Issue Two: Finality of Award

In their second issue, Appellants contend that the arbitrator's clarification award is "[i]ndefinite and [n]ot [f]inal" and the trial court therefore erred in confirming the award. In support of their argument, Appellants state that the clarification award "provides absolutely zero guidance as to how this award [against Joe, Jon, and 83 Properties] should be allocated among LBK, Kieffer Ventures, and Kieffer."

In *Wright v. Menta*, our sister court considered a similar matter. *See Wright v. Menta*, No. 05-15-00272-CV, 2016 Tex. App. LEXIS 5995, at **13-14 (Tex. App.—Dallas June 6, 2016, pet. denied) (mem. op.). Since "[t]he arbitrator concluded that Menta was a 'co-owner' of the patents without stating the percentage of co-ownership belonging to either Menta or Jerry Wright[,]" the appellant argued that the arbitration award was "'impermissibly vague[,]'" and the trial court's judgment confirming the arbitration award therefore was void and unenforceable. *Id.* at 13-14. The court of appeals disagreed, stating that vagueness is not a basis for vacating an arbitration award and citing the Texas Civil Practice and Remedies Code. *Id.*; Tex. Civ. Prac. & Rem. Code Ann. § 171.088 (listing acceptable grounds for vacating an arbitration award). Here, as in *Wright*, the arbitrator did not specify

the portion of the award to be paid to which party, yet this lack of precision does not constitute evidence of the grounds for vacatur set forth in section 171.088. *See id.* We hold that the trial court did not err in confirming the award. *See id.* § 171.087.

We overrule Appellants' second issue.

## CONCLUSION

Having overruled both of Appellants' issues, we affirm the trial court's judgment.

AFFIRMED.

JAY WRIGHT
Justice

Submitted on April 9, 2026
Opinion Delivered August 6, 2026

Before Golemon, C.J., Johnson and Wright, JJ.